UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JORGE GANDIA ORTEGA,                                    :

                              Petitioner,               :  09 Civ. 608 (LTS) (GWG)
                                                           02 Cr. 348
              -v.-                                       :
                                                           REPORT AND
UNITED STATES OF AMERICA,                               :  RECOMMENDATION

                              Respondent.               :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Jorge Gandia Ortega was convicted by a jury on February 10, 2004, of one count of

conspiracy to distribute or possess with the intent to distribute five kilograms or more of cocaine,

and of one count of distribution or possession with the intent to distribute five kilograms or more

of cocaine.  See 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 846.  On June 2, 2005, he was

sentenced principally to 360 months in prison.  The United States Court of Appeals for the

Second Circuit affirmed the judgment of conviction on September 28, 2007.  Ortega, who is

currently serving his sentence, petitioned this Court pro se under 28 U.S.C. § 2255 to vacate, set

aside, or correct his sentence.  In a previous opinion, Ortega v. United States, 2012 WL 2478277

(S.D.N.Y. June 27, 2012) ("Ortega I"), adopted by, 2013 WL 81330 (S.D.N.Y. Jan. 8, 2013), this

Court rejected several claims raised by Ortega in his petition and ordered an evidentiary hearing

on a single question: whether Ortega received effective assistance of counsel from attorney

Robert Koppelman with respect to Ortega's decision to go to trial rather than to plead guilty.

The Court appointed counsel for Ortega, and the hearing took place on June 3, June 12, and July

12, 2013.  For the reasons stated below, the sole claim remaining in the petition should be

denied.

I.  <u>BACKGROUND</u>

      A.      <u>Proceedings in the Criminal Case</u>

On January 7, 2003, Ortega and his co-defendant, Claudio Parra, were charged in a two-count indictment.  <u>See</u> Indictment, filed Jan. 7, 2003 (Docket # 18 in 02 Cr. 348) ("Indictment").  Count One charged Ortega with conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine, which was alleged to have occurred between 1998 and August 8, 2000.  <u>Id.</u> ¶¶ 1-2.  Count Two charged Ortega with a substantive count of distribution or possession with intent to distribute "approximately 20 kilograms" of cocaine.  <u>Id.</u> ¶ 4.

Ortega was arraigned on January 17, 2003, at which time he was represented by appointed counsel Lisa Scolari.  <u>See</u> Docket Sheet Entry for Arraignment, dated Jan. 17, 2003 (between Docket # 18 and Docket # 19 in 02 Cr. 348).  On February 3, 2003, attorney Larry Bronson filed a notice of appearance on behalf of Ortega.  <u>See</u> Notice of Appearance, filed Feb. 3, 2003 (Docket # 21 in 02 Cr. 348).  In April or May 2003, an attorney named Robert Koppelman met with Ortega and informed him that he would be assisting Bronson in representing him.  <u>See</u> Declaration of Jorge Gandia Ortega, dated Aug. 25, 2009 (annexed as Ex. F to Supplemental Exhibits in Support of Section 2255 Motion, filed Sept. 16, 2009 (Docket # 93 in 02 Cr. 348) ("Pet. Supp. Ex.")) ("Ortega Decl."), ¶ 11.  After this meeting with Koppelman, Ortega never saw Bronson again and came to believe that Bronson was no longer working on his case.  <u>Id.</u>  The docket sheet reflects that Koppelman first appeared at a pretrial conference in the case on May 15, 2003, <u>see</u> Docket Sheet Entry for Pretrial Conference, dated May 15, 2003 (between Docket # 24 and Docket # 26 in 02 Cr. 348), and was the sole attorney to make appearances for Ortega after that date, including at Ortega's trial, <u>see</u>, <u>e.g.</u>, Minute Entry for Jury Trial Proceedings Held Before Judge Peter K. Leisure, dated Jan. 26, 2004 (between

Docket # 46 and Docket # 49 in 02 Cr. 348); see also Ortega Decl. ¶ 11.

Judge Peter K. Leisure presided over Ortega's trial, which took place in January and February 2004.  See Trial Transcripts, filed Mar. 24, 2004 (Docket ## 56, 57 in 02 Cr. 348) ("Tr.").  The evidence at trial is not directly relevant to this petition and thus is summarized only briefly.  Over the course of the trial, the Government introduced evidence of Ortega and Parra's involvement in drug trafficking in the form of documents, drug paraphernalia seized from certain residences and cars, testimony from law enforcement officers and from Ortega's accomplices, and 20 kilograms of seized cocaine.  A summary of the evidence from the Court's prior ruling in this matter is as follows:

> Eddy Rosario, one of Ortega's accomplices, testified that around 1999 he began to work with Ortega in a cocaine-distribution business in which they imported cocaine from Puerto Rico through couriers, diluted the cocaine's purity, and repackaged and sold it.  (Tr. 615; Rosario: Tr. 641-47, 664).  Hamlet Gonzalez, the other cooperating witness who testified at trial, began working for Rosario and Ortega around October 1999.  (Gonzalez: Tr. 317, 332-33).  Individuals brought six kilos of cocaine to New York "taped to their bodies" every two weeks; Gonzalez then worked with Ortega to prepare it to be brought to North Carolina.  (Gonzalez: Tr. 334-46).  Gonzalez would give proceeds from the sales of the cocaine to Rosario and Ortega.  (Gonzalez: Tr. 338; Rosario: Tr. 661-62).  Gonzalez traveled to Puerto Rico with Ortega or met him there to bring money to purchase drugs. (Gonzalez: Tr. 338-39; Rosario: Tr. 664-65).  In June or July 2000, Rosario hired Parra to help with the drug business.  (Gonzalez: Tr. 342).  Parra would pick up the couriers from the airport and bring them, with the cocaine, to Gonzalez's apartment.  (Gonzalez: Tr. 342-43).
>
> On August 8, 2000, Parra brought 20 kilograms of cocaine to Gonzalez's apartment on Matthews Avenue in the Bronx.  (Gonzalez: Tr. 344-45).  Ortega and Gonzalez diluted, packaged and placed the cocaine into a suitcase at the apartment (Gonzalez: Tr. 348-49), after which Parra picked them up in his car.  (Gonzalez: Tr. 351-52).  Ortega placed the packaging from the cocaine in the trunk of Parra's car, as Ortega had said "it would be a good idea for [Parra] to get rid of them far away from the apartment."  (Gonzalez: Tr. 352; Maher: Tr. 51; Mojica: Tr. 205).  Parra drove to a parking garage on Webster Avenue in the Bronx, where Ortega and Gonzalez exited Parra's vehicle and entered a black Lexus sport utility vehicle.  (Mojica: Tr. 207-08).  At that point, law enforcement officers arrested Gonzalez, Ortega and Parra (Maher: Tr. 44-45; 52-53; Gonzalez:

Tr. 353-54).  When law enforcement officers searched Gonzalez's Matthews
Avenue apartment that evening, they found a suitcase containing approximately
20 kilograms of cocaine.  (Maher: Tr. 60; Murphy: Tr. 145-46; Hall: Tr. 577-79).

Neither Ortega nor Parra testified at trial . . . .

Ortega I, 2012 WL 2478277, at *5.

Ortega I described the verdict and sentencing as follows:

On February 10, 2004, the jury returned a verdict finding Ortega guilty of
conspiracy to distribute and possess with the intent to distribute more than five
kilograms of cocaine, and of the substantive count of distribution or possession
with intent to distribute.  See Indictment; Verdict Sheet, dated Feb. 10, 2004
(annexed to Indictment).  On May 24, 2004, Judge Leisure held a Fatico hearing
before sentencing to determine issues of fact regarding sentencing: in particular,
the total quantity of cocaine involved.  At the hearing, Rosario provided
additional testimony about his cocaine transactions with Ortega.  See Hearing
Transcript, filed June 1, 2004 (Docket # 62 in 02 Cr. 348) 5-25.  Judge Leisure
found that the conspiracy involved 120 kilograms of cocaine, which gave a base
offense level of 36, and increased the offense level by 4 points to 40 based on his
finding that Ortega was an "organizer or leader" of criminal activity involving
five or more people under the United States Sentencing Guidelines ("U.S.S.G.").
See Sentencing Hearing Transcript, filed June 30, [2005] (Docket # 79) ("S. Tr.")
39, 40, 43.  The guidelines range for this level, with a criminal history category of
III or IV, was 360 months to life.  See Sentencing Table (annexed as Ex. K to
Resp. App'x) ("Sentencing Table").  On June 2, 2005, Judge Leisure sentenced
Ortega principally to 360 months' imprisonment followed by a period of ten
years' supervised release.  (S. Tr. 44).

2012 WL 2478277, at *5.

On appeal, Ortega argued that his Sixth Amendment rights were violated by the

admission, through the testimony of a cooperating witness, of an incriminating statement made

by Parra and that the District Court imposed an unreasonable sentence on him.  See United

States v. Parra, 249 F. App'x 226, 228 (2d Cir. 2007).  On September 28, 2007, the Second

Circuit rejected both of these claims.  See id.  Ortega did not file a petition for a writ of

certiorari.

B.       The Habeas Petition

Ortega submitted his motion to vacate, set aside, or correct his sentence on December 24, 2008.  See Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, filed Jan. 22, 2009 (Docket # 1) ("Pet. Mot.").  Ortega sought relief on three main grounds: (1) that his trial counsel was ineffective for failing to advise him to proceed to a bench trial on stipulated facts; (2) that he did not receive effective assistance of trial counsel with respect to his decision to go to trial rather than plead guilty; and (3) that his trial counsel was ineffective due to the cumulative impact of various deficiencies or errors during the pretrial, plea, trial, sentencing, and direct appeal process.  Id. at 4-7.[1]

On June 27, 2012, this Court issued a report and recommendation finding that Ortega's petition "should be denied in its entirety, with the exception of Ortega's claim that he received effective assistance of counsel with respect to his decision to go to trial rather than to plead guilty during the period that he was represented by Robert Koppelman."  Ortega I, 2012 WL 2478277, at *16.  Additionally, this Court ordered that Ortega be appointed counsel and that a testimonial hearing be held to elicit evidence on Ortega's remaining claim.  Id.  On January 8, 2013, Judge Swain adopted the report in its entirety.  See Ortega v. United States, 2013 WL 81330, at *2 (S.D.N.Y. Jan. 8, 2013) ("Ortega II").

---

[1]  Following the initial petition, the following papers were filed: Memorandum of Law of the United States of America in Opposition to Defendant Jorge Gandia Ortega's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct His Sentence, filed July 29, 2009 (Docket # 88 in 02 Cr. 348); Appendix of Declarations and Exhibits in Support of the United States of America's Opposition to Defendant Jorge Gandia Ortega's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct His Sentence, filed July 29, 2009 (Docket # 89 in 02 Cr. 348) ("Resp. App'x"); Movant's Renewed Motion for Discovery, filed Sept. 16, 2009 (Docket # 92 in 02 Cr. 348); Pet. Supp. Ex.; Movant's Statement of Disputed Issues of Material Fact, filed Sept. 16, 2009 (Docket # 94 in 02 Cr. 348); Movant's Traverse, filed Sept. 16, 2009 (Docket # 95 in 02 Cr. 348).

C.    Evidentiary Hearing

This Court held an evidentiary hearing on June 3, June 12, and July 12, 2013.[2]  The

petitioner called Jorge Gandia Ortega, Larry Bronson, Johnny Martinez, and Evelyn Guadarrama

as witnesses, and the Government called Robert Koppelman and Assistant United States

Attorney Joon Kim as witnesses.  Before describing the testimony at the hearing, we discuss the

written submissions from Ortega regarding his counsel's representation and the plea offers.

1.    Submissions Regarding Representation by Counsel and Plea Offers

Ortega's pro se petition asserted that "[p]rior to trial and during the plea process, counsel

affirmatively misadvised Mr. Ortega that the government had a very weak case against him [and

that] he stood a very good chance of winning at trial."  Pet. Mot. at 11, ¶ 20.  Ortega also stated

that, absent counsel's advice, "there [was] a reasonable probability that [he] would have pleaded

guilty or nolo contendere instead of proceeding to trial."  Id. at 16.  In support of these

assertions, Ortega submitted a declaration dated August 25, 2009, in which he recounted

interactions he had with counsel Larry Bronson and Robert Koppelman.  See Ortega Decl.

Ortega stated that in March 2003, soon after he retained Bronson as counsel, Bronson told

Ortega that "the government had only one witness, no Title-III evidence, and no physical

evidence to use against [Ortega]."  Id. ¶ 3.  Bronson said that, based upon a "thorough review" of

the facts of the case, he thought it would be "foolish" of Ortega to plead guilty and receive a ten-

year sentence, given that he "could win at trial and go home."  Id.  Bronson informed him that if

---

[2]  See Transcript of June 3 Proceedings Before the Honorable Gabriel W. Gorenstein,
filed June 13, 2013 (Docket # 40); Transcript of June 12 Proceedings Before the Honorable
Gabriel W. Gorenstein, filed June 20, 2013 (Docket # 42); Transcript of July 12 Proceedings
Before the Honorable Gabriel W. Gorenstein, filed July 26, 2013 (Docket # 45) (collectively,
"Hr.").  The exhibits introduced by the Government at the hearing are docketed as Government
Exhibits Introduced at Evidentiary Hearing, filed Jan. 15, 2014 (Docket # 58) ("Gov't Hg. Ex.")

he pled guilty, he was facing 121-151 months and that if he went to trial and lost, he was facing 168-210 months.  Id. ¶ 9.  Bronson told him that he was risking only an additional 17 months by going to trial rather than pleading guilty.  Id. ¶¶ 4, 9.

Ortega also submitted a letter Bronson had written to Ortega's wife, Evelyn Guadarrama, regarding Guadarrama's "family's insistence" that Ortega "plead[] guilty" and setting out the difference in the prison sentence that Ortega would face if he pled guilty rather than going to trial.  See Letter from Larry Bronson to Eveyln Guadarrama, dated Mar. 10, 2003 (annexed as Ex. E to Pet. Mot.) ("Bronson Letter").  The letter was consistent with what Ortega alleged that Bronson had told him directly.  In the letter, Bronson wrote that if Ortega "were to plead guilty he [was] facing a mandatory minimum sentence of ten years to forty years," and if Ortega was to lose at trial he would face "a minimum of one hundred sixty eight months and a maximum sentence of two hundred and ten months" under the sentencing guidelines.  Id. at 1.  Bronson then calculated the "difference between [the] sentence" if Ortega pled guilty and if he went to trial as "one twenty one and one fifty one subtracted from one hundred and sixty eight months." Id.  So, Bronson stated, it was "possible" that Ortega "would only receive an additional seventeen months if he were to go to trial and lose, if we are successful he will receive no time in jail."  Id.  Bronson concluded the letter by giving Guadarrama his opinion of Ortega's case.  Id. at 1-2.  He stated that because the Government's case against Ortega was "based on solely on the testimony of an informant[,] Brian Gandy,"[3] and because there was "very little difference between the plea agreement and the trial[,] it [was] most important for [Ortega] to seriously consider going to trial."  Id. at 1 Bronson's later states that the decision to go to trial was not a

---

[3]  It appears that Brian Gandy is the same person as Hamlet Gonzalez.  (Hr. 14).

"very risky proposition" as they had a "very good chance of discrediting the informer and [because] there [were] no wiretaps of" Ortega.  Id.  Finally, Bronson informed Guadarrama that she should send him $5,000 that week.  Id. at 2.  Ortega was informed by Guadarrama of some of the contents of the March 10, 2003 letter.  Ortega Decl. ¶ 5.

In his declaration, Ortega noted that in "May or June of 2003," a Government witness, Hamlet Gonzalez, informed Ortega that he, Eddy Rosario, and "possibly others" would be called to testify against Ortega.  Id. ¶ 7.  When Ortega informed Bronson of this conversation, Bronson "brushed aside [his] concerns that the government had sufficient evidence against [him] for a conviction if [he] went to trial."  Id. ¶ 9.  Ortega did not tell Bronson that he wished to plead guilty but only that he was "seriously considering pleading guilty."  Id. ¶ 8.

Some time after his conversation with Gonzalez, but in a time period identified by Ortega as "April or May 2003," Koppelman came to see Ortega, informed him that he was an associate of Bronson's, and told him that he would be assisting Bronson in representing Ortega.  Id. ¶ 11. After that meeting with Koppelman, Ortega never saw Bronson again.  Id.  Koppelman brought discovery materials to his initial meeting with Ortega.  Id. ¶ 12.  He and Ortega discussed "the nature and status of the government's case" against Ortega.  Id.  Koppelman "insisted that Gonzalez was the only witness the government had to use against [Ortega]."  Id.  He advised Ortega to go to trial.  Id.

Ortega asserted in his declaration that in October or November 2003, he and Koppelman had a meeting with Government attorneys at which the Government presented a plea offer for a sentence of 11 years.  Id. ¶ 13.  At this meeting, "Koppelman debated the strength of their case with the government attorneys."  Id.  In private, Koppelman informed Ortega that "the government had a weak case, and advised [him] to take [his] case to trial."  Id.  Ortega does not

8

specify what the Government stated at that session with respect to the plea offer except that it was for "eleven years."  Id.

In response to Ortega's declaration, the Government submitted handwritten notes from the Assistant United States Attorney assigned to the case, Joon H. Kim, as well as a sworn declaration from AUSA Kim.  See Government Notes, dated Dec. 9, 2003 (annexed as Ex. E to Resp. App'x) ("Kim Notes"); Declaration of Joon H. Kim, dated July 28, 2009 (annexed to Resp. App'x) ("Kim Decl."), ¶ 5.  Kim stated in his declaration that the notes, which are dated December 9, 2003, indicate that he met with Ortega and Koppelman in December 2003.  Kim Decl. ¶¶ 4-5.  At the meeting, Kim informed Ortega of the Guidelines sentencing range he would face under the plea offer and the sentence he would face at trial.  Kim Decl. ¶ 4.  The notes state that, if Ortega went to trail and were convicted, "even under [a] very conservative estimate," Ortega's "best case scenario" would be 360 months to life in prison.  Id. ¶ 5; Kim Notes at 1.  On the other hand, if Ortega pled guilty, he faced 135-168 months.  Kim Notes at 1.  The notes state that Ortega's deadline to accept this plea offer was December 12, 2003.  Id.

In a January 21, 2004 internal e-mail, Kim recalled that he had conducted a "reverse proffer" with Ortega "a month ago."  See Email from Joon Kim to Richard Daddario, dated Jan. 21, 2004 (annexed as Ex. G to Resp. App'x) ("Jan. 21 Email").  The email stated that Kim had informed Ortega at the reverse proffer that his "post-conviction guidelines range would be way above 20 years."  Id. (internal punctuation omitted).

Ortega stated in his declaration that in December 2003, not long after the reverse proffer with Kim, Koppelman informed him that the Government had a new plea offer of 13 years.  Ortega Decl. ¶ 14.  Ortega told Koppelman that he wanted to accept the offer, but Koppelman again told Ortega that the Government's case was very weak and advised him to go to trial.  Id.

Ortega stated that, after consulting with his family, it was his "intention and desire to plead guilty." Id. ¶ 15. However, based on Koppelman's "insistence that the choice [Ortega] had was between having a very good chance to win and go free[,] or, in the worst case, doing a short time (17 months) more than [he] would have had to do by accepting the government's thirteen year plea if [he] lost," id. ¶ 16, Ortega ultimately did not accept the plea offer.

In January 2004, the Government learned that Ortega had a conviction for a prior drug felony. See Jan. 21 Email.[4] In an email dated January 21, 2004, AUSA Kim sought approval from his supervisor to extend a plea offer to Ortega of 235 to 293 months imprisonment. Id. This proposed offer was based on a drug quantity of 150 kilograms of cocaine and assumed a criminal history category of IV. Id. Kim does not remember if the offer was extended to Ortega. Kim Decl. ¶ 6. On January 22, 2004, the Government filed a prior felony information. See Prior Felony Information, filed Jan. 22, 2004 (Docket # 46 in 02 Cr. 348).

Ortega claimed that "[u]ntil the day of trial, [he] did not know that he was going to trial instead of pleading guilty." Pet. Mot. at 16, ¶ 48. Ortega further contended that, on the first day of trial, January 26, 2004, Ortega informed Koppelman that he did not want to go to trial and wished to plead guilty. See Ortega Decl. ¶ 17. At that point, Koppelman "conferred with the government's attorneys, and informed [Ortega] that [he] could plead guilty, but that [he] would be . . . exposed to a potential sentence of life imprisonment" due to his prior convictions. Id.

### 2.   Ortega's Testimony

At the evidentiary hearing, Ortega repeated some of the allegations he had made in the

---

[4] The effect of the prior felony conviction, if presented to the court in an information, would be to make the mandatory minimum sentence 20 years rather than 10 years. See 21 U.S.C. §§ 841(b)(1)(A), 851.

papers supporting his pro se petition but omitted others.  He testified in Spanish through the assistance of an interpreter.

Ortega said that, during his initial meeting with Bronson, the two of them discussed Ortega's prior criminal history and the charges brought against him.  (Ortega: Hr. 9-10). Bronson asked Ortega to give him $5,000 so that he could hire an investigator for Ortega's case. (Ortega: Hr. 11).  During a subsequent meeting, Bronson and Ortega discussed the strengths and weaknesses of the Government's case against Ortega, and Bronson advised Ortega that the Government had a weak case because Ortega "was not arrested with the drugs [and] there were no phone calls and no video[s]."  (Ortega: Hr. 12-13).  Additionally, Bronson advised Ortega that only one witness, Hamlet Gonzalez, would be testifying against Ortega and that Bronson would "be able to break [Gonzalez's] testimony."  (Ortega: Hr. 13).  In Bronson's opinion, "it was a good case to take to trial."  Id.  Ortega had about four or five such meetings with Bronson until Koppelman took over Ortega's case.  (Ortega: Hr. 13-14).

At about the same time that Bronson was representing him, Ortega had about eight to ten communications with Gonzalez at the prison by means of hand signals and mouthing words silently.  (Ortega: Hr. 16-19).  Gonzalez urged Ortega not to go to trial, because if he did, he would likely get a 20-year prison sentence.  (Ortega: Hr. 19).  During one such communication, Gonzalez informed Ortega that he would be testifying against Ortega if he went to trial and that Eddie Rosario and at least one other person would also be taking the stand against Ortega. (Ortega: Hr. 20).  After having these communications with Gonzalez, Ortega told Bronson about these potential Government witnesses.  Id.  In response, Bronson allegedly told Ortega not to listen to what Gonzalez said because "in case you lose, you have to serve 17 extra months, that will not reach 20 years."  Id.  Ortega testified that he told Bronson that he wanted to plead guilty,

but Bronson still recommended that Ortega go to trial because the Government lacked physical

evidence or strong witnesses.  (Ortega: Hr. 20-21).

 During at least one meeting that Ortega had with Bronson, Bronson explained how the

sentencing guidelines applied to Ortega's case.  (Ortega: Hr. 21).  Bronson calculated Ortega's

sentence range as "11 to 13 years" if he pled guilty and only an additional 17 months on top of

the 13 years if he went to trial and lost.  Id.  At some point, Ortega told Bronson that his wife, his

uncle, Gonzalez, and another prisoner named Johnny Martinez all advised him not to go to trial.

(Ortega: Hr. 22-26).  Based on their advice, Ortega wanted to plead guilty.  (Ortega: Hr. 26).

However, Bronson responded, "listen, don't talk to anybody about your case . . . I'm your

attorney" (Ortega: Hr. 21-22), and said that his "best advice" was to go to trial (Ortega: Hr. 26).

Bronson reiterated that the Government did not have a strong case because they only had one

witness, Gonzalez, to testify against him.  Id.

 On cross-examination, Ortega testified that, although Bronson did not directly prohibit

him from pleading guilty, he was "putting obstacles."  (Ortega: Hr. 90-91).  When asked to

explain what he meant, Ortega testified that Bronson delayed a guilty plea by telling Ortega to

"stay calm" and that it was "still early."  (Ortega: Hr. 91).  Ortega then testified, "I cannot say

[he] prohibite[ed] me . . . But his advice was to the effect that I should not plead guilty."

(Ortega: Hr. 94).  When asked whether he would have pled guilty if the agreement was for a 20-

year sentence, Ortega responded, "[i]f that would have been the offer without going to trial and

if no other offer would have been ever discussed except this 20 year offer, I would have taken

the 20 years."  (Ortega: Hr. 102).  Ortega then testified, "I wanted to plead guilty.  I did not want

to go to trial.  And whatever they will tell me, I would have to get for the 20 kilos, that was the

offer I wanted to accept."  (Ortega: Hr. 103).

Ortega also testified about his conversations with Koppelman.  Koppelman began working on Ortega's case at some point toward the end of April 2003.  (Ortega: Hr. 9).  After Koppelman took over, Ortega never met with Bronson again.  (Ortega: Hr. 96).  At the first meeting between Ortega and Koppelman, Koppelman brought discovery materials to give to Ortega, including various documents and personal items that were taken from Ortega at the time of his arrest.  (Ortega: Hr. 27).  During this meeting, Ortega and Koppelman discussed the case, and Ortega told Koppelman about his prison communications with Gonzalez.  (Ortega: Hr. 28).  At this point, Ortega knew that Gonzalez, Rosario, and at least one another person would testify against him if he went to trial.  (Ortega: Hr. 98).  Ortega told Koppelman that he wanted to plead guilty, but Koppelman, like Bronson, told Ortega that he should go to trial because the Government had a weak case against him.  (Ortega: Hr. 28).  Koppelman went over the sentencing guidelines again with Ortega and calculated the same potential sentencing ranges as Bronson had — that is, that Ortega was "facing 11 to 13 years" and "[i]f we don't fare well, then it will be 17 months on top."  Id.  As to the effect of his prior conviction in increasing his mandatory minimum sentence from 10 years to 20 years under 21 U.S.C. § 851, Ortega testified that Koppelman did not explain this to him until the day before he was sentenced.  (Ortega: Hr. 74-75).  Ortega also testified that nobody explained to him how being a member of a conspiracy could affect his sentence by increasing the amount of drugs he was charged with possessing. (Ortega: Hr. 77).

Regarding the meeting he had with Koppelman and AUSA Joon Kim in December 2003, Ortega testified that Kim presented him with a plea offer that would have resulted in a sentence of approximately 11 years.  (Ortega: Hr. 31).  Ortega claims that, when Kim left them alone, he told Koppelman, "I want to take the eleven years" but that Koppelman told him to "[c]alm

down" because he was arguing with the Government attorney about the "discovery" materials that the Government had failed to bring to the meeting.  (Ortega: Hr. 32-33).  Ortega testified that, at the meeting, Kim and Koppelman did not discuss the evidence that the Government had against Ortega and did not discuss the Government's intended witnesses.  (Ortega: Hr. 36-37).  However, Ortega ultimately admitted that Koppelman and Kim debated the relative strengths of their cases.  (Ortega: Hr. 39).  Ortega also testified that at this point he knew that "if [he] went to trial it would be 20 years."  Id.  In total, the meeting lasted approximately 30 to 40 minutes.  (Ortega: Hr. 40).  Ortega testified that, after the meeting, Koppelman reiterated to Ortega his view that the Government's case was weak, and thus, "[u]nder the advice of the lawyers," Ortega "decided to reject" the plea agreement that Kim had offered.  (Ortega: Hr. 99).  Later in the hearing, however, Ortega testified that Koppelman "ignored [his] request" to take the 11-year plea offer.  (Ortega: Hr. 105).

The next time Ortega met with Koppelman was more than a week later.  (Ortega: Hr. 70).  Ortega once again told Koppelman that he wanted to plead guilty, but Koppelman again advised Ortega to go to trial because of the weakness of the Government's case.  (Ortega: Hr. 70-71).  Koppelman allegedly said, "Relax.  If these people show me anything, if there is a problem, if I see anything, we plead guilty."  (Ortega: Hr. 71).

Ortega also testified about a conversation that he overheard between his co-defendant, Claudio Parra, and Parra's attorney on the first day of trial.  (Ortega: Hr. 73).  Parra's attorney allegedly told Parra "that he had no defense and that he should plead guilty," to which Parra responded, "No, and I hope to God I will fare okay from this."  Id.  Ortega then told Koppelman about what he overheard and restated his desire to plead guilty.  Id.  Koppelman allegedly responded, "Parra is Parra and you are you."  Id.  Ortega testified that Koppelman told him that

14

the Government would accept a guilty plea "under the statute."  (Ortega: Hr. 74).  Ortega did not

understand what Koppelman meant by this, so he asked Koppelman what he recommended.  Id.

Koppelman said "[t]o go to trial," and Ortega "paid attention to him and . . . did it."  Id.

       3.   Kim's Testimony

Joon H. Kim, the Assistant United States Attorney assigned to Ortega's case, testified

about the "reverse proffer" session he had with Ortega and Koppelman in December 2003.

(Kim: Hr. 42, 54).  Kim explained that a reverse proffer session typically allowed him to "sit in a

room with both defense counsel and the defendant and explain [the Government's] view . . . of

the strength of the evidence and the difference that [the defendant was] likely to face between

going to trial and not going to trial."  (Kim: Hr. 43).  Kim stated that during some reverse

proffers he would extend a plea offer "in order to have a discussion about what the likely

difference is between going to trial and not going to trial" and to examine "where [the defendant

is] likely to end up if they agreed to take a plea versus if they went to trial."  Id.  As to Ortega's

case, Kim testified that the "purpose of the reverse proffer in [Kim's] mind was to lay out what

[Ortega] would likely face if he went to trial and lost."  (Kim: Hr. 55).

In explaining the typical structure of the reverse proffers he conducted, Kim stated that

he "would lay out what [the Government] would present at trial" and "the likely evidence that

would come up at trial and how it would come up."  (Kim: Hr. 44).  When questioned about the

evidence he specifically went over with Ortega, Kim said, "I don't have a recollection of

everything I said or exactly how I said it [but] I do recall generally going through the evidence

that we expected to put on at trial."  (Kim: Hr. 49).  When asked whether he discussed the

Government's witnesses with Ortega, Kim explained, "I don't have a specific recollection, but I

imagine I would have because we were going to put on cooperating witnesses [and] the fact that

they were cooperating was not a secret."  Id.

Kim also testified about certain handwritten notes that he had taken during the reverse proffer.  See Kim Notes.  He explained that the notes included calculations of the "difference in the potential sentences that Mr. Ortega faced between going to trial and a plea offer that was subject to approval as provided in the notes." (Kim: Hr. 46).  Furthermore, the notes reflected Kim's assessment that if the Government went to trial, "we would likely establish that the conspiracy involved hundreds of kilograms of cocaine and five kilograms of heroin." (Kim: Hr. 47).  The notes included a calculation of Ortega's sentencing range if the Government proved his membership in a conspiracy involving 150 kilograms of cocaine.  Id.  Under this scenario, Ortega's offense level would be at least 40, which would lead to a guidelines range of 360 months to life in prison.  (Kim: Hr. 47-48).

The notes that Kim was referring to were introduced into evidence at the hearing.  See Kim Notes.  They reflect that Kim's sentencing calculation arose based on an assumption of "150 kg" — presumably of cocaine —  leading to a base offense level of "38." See id. at 1. Added to this number were enhancements for "role," "obstruction," and "guns." Id.  The final offense level was listed as "43" with an arrow indicating the words "mandatory life." Id. Underneath this, Kim wrote, "even under way conservative estimate = 38 + 2 = 40." Id.  These words are followed by an arrow indicating "360 - life." Id.

After looking at an email that he had written to his supervisor approximately six weeks after the reverse proffer, Kim testified that he believed that he "would have written down as accurately as [he] could at the time what [he] meant to tell" his supervisor.  (Kim: Hr. 55).  The email implicitly refers to the 20-year mandatory minimum that arose from the Government's discovery that Ortega had a prior felony conviction and notes that Ortega was told "during a

16

reverse proffer a month ago" that his post-conviction guidelines range would "be way above 20 years anyway."  See Jan. 21 Email.

Kim's handwritten notes also included details about a plea offer that was to be extended to Ortega at the reverse proffer session.  (Kim: Hr. 48).  The notes reflect that the plea offer was based on "20 kg," resulting in an offense level of "34."  Kim Notes at 1.  The notes further reflect that with three points taken off for acceptance of responsibility, the level became 31.  Id. Assuming a "CH" — that is, criminal history — of "III," the resulting offer described in the notes was "135-168 months."  Id.  Underneath this calculation Kim wrote, "deadline to tell us is Friday 12/12/03."  Id.  After reviewing the notes at the hearing, Kim stated that the plea offer was likely subject to approval by his supervisors and that it had a deadline of December 12, 2003.  (Kim: Hr. 48).

Kim also discussed a document he described as a "draft of a plea agreement," which is a letter dated December 11, 2003, from him and another AUSA named Stephen A. Miller.  See Plea Agreement Draft, dated Dec. 11, 2003 (annexed as Ex. 5 to Gov't Hg. Ex.("Plea Draft")); Kim: Hr. 51-52.  This draft agreement contains the identical calculation as in the handwritten notes and presents a plea offer with a sentencing guidelines range of 135-168 months.  See Plea Draft at 2.  A December 9, 2003 letter from Kim to Judge Leisure also makes reference to ongoing "plea negotiations."  See Letter to Judge Leisure, dated Dec. 9, 2003 (annexed as Ex. D to Resp. App'x); Hr. 60-61.

Kim next testified about the difficulty he had in obtaining information about Ortega's criminal record.  As he put it:

> I recall that his criminal history included a number of arrests and convictions in
> Puerto Rico and I remember trying to get information and underlying
> documentation relating to those prior convictions from different courts in Puerto

17

> Rico and having trouble both in terms of getting someone to respond to my
> requests for them and also just the timing of getting them, so I recall information
> trickling in, including getting it as we approached trial.

(Kim: Hr. 53).  When questioned about why he was not aware of all of Ortega's prior

convictions given that he had Ortega's rap sheet, Kim answered, "I do remember with Mr.

Ortega that there was information that wasn't all in the rap sheet that we were continuing to get

in as we dug more into his criminal history."  (Kim: Hr. 62).  Kim continued, "his rap sheet

indicated in instances where there were arrests but [gave] no clear indications on how those

arrests were resolved . . . [or] whether they were resolved by pleas or convictions or withdrawn."

(Kim: Hr. 62-63).  Kim testified that it was not until about January 2004 that the Government

obtained sufficient information to conclude that Ortega's criminal history "would qualify for the

filing of a prior felony information."  (Kim: Hr. 65-66).

　　　　Kim testified that after the Government learned that Ortega had been convicted of a prior

felony, he considered making a second plea offer to Ortega for 235 to 293 months.  (Kim:

Hr. 53-54).  His proposal to make such an offer is reflected in the email from January 21, 2003.

See Jan. 21 Email.  Kim could not recall whether he actually communicated this second plea

offer to Koppelman and Ortega or if he just discussed the possibility with his supervisor.  (Kim:

Hr. 53-54).

　　　　4.　　Koppelman's Testimony

　　　　Robert Koppelman, a former assistant district attorney, has practiced criminal law since

1967 in both state and federal courts.  (Koppelman: Hr. 120).  At the time he represented Ortega,

Koppelman had an association with Larry Bronson.  (Koppelman: Hr. 123).  Koppelman

explained that he "had a relationship with Bronson where [Koppelman] provided services to

[Bronson] in return for office space."  (Koppelman: Hr. 156).  Koppelman did not think that he

18

ever took any fees directly from Ortega or Ortega's family because Bronson negotiated the fee arrangement.  (Koppelman: Hr. 125, 156).  Koppelman did not believe that he was paid anything specifically for Ortega's case, and thus, as Koppelman testified, "monetarily speaking, it was of no concern to me whether the case went to trial or not, except to the extent that I would be spending time that I might be able to spend in a different way."  (Koppelman: Hr. 156).

      Koppelman's general practice at the time he represented Ortega was to review the sentencing guidelines with all of his clients.  (Koppelman: Hr. 121).  Indeed, "[i]t was an important part of the case to let the client know what the guidelines were for his case."  Id.  He would convey any plea offers to his clients and "[i]f there was an indication that the client wanted or might consider taking a plea, [he] would convey that to the prosecutor."  Id.  When asked if he ever "disregarded a client's instruction to accept a plea agreement offered by the government," Koppelman responded, "[a]s far as I know, never."  Id.  Koppelman also stated that his practice in reviewing discovery or other evidence with clients "var[ied] from case to case, from type of evidence to type of evidence."  (Koppelman: Hr. 122).

      Koppelman did not specifically recall whether there were any plea offers extended by the Government to Ortega.  (Koppelman: Hr. 123).  Thus, he did not remember whether he discussed any plea offers with Ortega.  (Koppelman: Hr. 124).  However, Koppelman testified, "[t]he only thing I can say is that as far as I know I have never failed to convey an indication that my client wanted to plead, if such an indication had been made to me.  I don't recall any circumstances under which the client told me that he wanted to plead guilty."  Id.  Koppelman clarified that by "the client" he meant Ortega specifically.  Id.  Koppelman emphasized that his best recollection was that Ortega never instructed him to accept a plea offer from the government.  Id.  On cross-examination, when asked, "is there ever a case you tried in which a

19

defendant advised you that he did not want to go to trial but he went to trial despite that advice," Koppelman responded, "No."  (Koppelman: Hr. 130).  When asked what he would do under circumstances where the client thought that a plea agreement was reasonable and wanted to take it, Koppelman said, "I would think that under ordinary circumstances I would go along with his wishes."  (Koppelman: Hr. 134-35).  Koppelman clarified, "[t]here are people who want to plead guilty for the wrong reasons, people who want to go to trial for the wrong reasons.  Part of my job was to advise what I believed, based on my experience, was the best path to follow."  (Koppelman: Hr. 136).  He also testified that he "would not have ignored a client's desire, expressed desire to plead guilty."  (Koppelman: Hr. 151).

Koppelman has attended several reverse proffers with his clients, but he did not remember the specific details of the reverse proffer in Ortega's case.  (Koppelman: Hr. 139-40).  Koppelman later testified that, although he did not remember the specifics of this reverse proffer, he knew that "a reverse proffer has to be more than a plea offer and a discussion about guidelines.  The whole idea of the reverse proffer is to find out what the evidence is either to help at trial or to help in deciding whether to plead guilty."  (Koppelman: Hr. 151).

The Court asked Koppelman about certain statements Ortega had made accusing Koppelman of ignoring Ortega's requests to plead guilty.  (Koppelman: Hr. 148-49).  Koppelman responded, "I was never told by Mr. Ortega or anyone else that he was adamant about pleading guilty . . . I was not told that he wants to plead guilty and then did nothing about that.  That didn't happen."  (Koppelman: Hr. 149).  On the issue of his advice regarding the strength of the Government's case, Koppelman testified, "I would never tell a client that they [referring to the Government] have nothing against him, because for one thing I wouldn't know if they had anything against him and I don't think it was any secret, if I recall correctly, that at

20

the very least they had one cooperator and I believe they had drugs."  (Koppelman: Hr. 149).
Koppelman also testified that he had never given a "guarantee" to a client that he would obtain
an acquittal.  (Koppelman: Hr. 137).

     5.    <u>Martinez's Testimony</u>

Johnny Martinez testified that he lived in the same prison dorm as Gonzalez when Ortega
was incarcerated prior to his trial, so he was able to hear the conversations that Ortega had with
Gonzalez.  (Martinez: Hr. 163-64).  Over the Government's hearsay objection, Martinez stated,
"Gonzalez was always trying to tell Mr. Ortega to cop out to the thirteen years because the
government had plenty witness against him if he went to trial."  (Martinez: Hr. 165).  Martinez
testified that he also told Ortega to plead guilty and take the 13 years.  (Martinez: Hr. 168).
These conversations occurred from April to July of 2003.  (Martinez: Hr. 172).

     6.    <u>Guadarrama's Testimony</u>

Evelyn Guadarrama, who testified in Spanish through an interpreter via video from
Puerto Rico, stated that Ortega was her "common-law husband" and that she had been living
with him since June 1985.  (Guadarrama: Hr. 176).  During the period between Ortega's arrest
and trial, Guadarrama had numerous conversations with Ortega, during which they often
discussed Ortega's criminal case.  (Guadarrama: Hr. 177).  When asked about her discussions
with Ortega concerning possible plea offers, she said, "the first one was eleven years . . . then,
second, he told me that his lawyer was offering him thirteen years.  And then he said to me that
they were offering him seventeen years."  (Guadarrama: Hr. 178).  Guadarrama testified, "I told
[Ortega] all the time to plead guilty.  I told him all the time . . . but over there his lawyer would
tell him to fight the case, to fight the case because it was a weak case."  (Guadarrama: Hr. 179).

Guadarrama testified that she paid Bronson $10,000 up front for his services in

representing Ortega.  (Guadarrama: Hr. 181).  Later, she mailed to Bronson ten additional

payments of $1,000 each.  (Guadarrama: Hr. 183).  Bronson told her that the money "was for

legal expenses because he knew that the case was going to fall down because there wasn't

sufficient evidence."  (Guadarrama: Hr. 184).  When she found out that Bronson had told Ortega

that "the case was worth fighting for," she in turn told Ortega that "if there [was] one witness

then [he was] not going to win that case."  (Guadarrama: Hr. 185).  Guadarrama did not

remember ever speaking with Koppelman about Ortega's case.  (Guadarrama: Hr. 186-87).

On cross-examination, Guadarrama testified that during the first few months of Ortega's

incarceration, he told her about the evidence he expected the Government to present at trial,

including the 20 kilograms of cocaine that had been seized by the Government and the fact that

Gonzalez and Rosario would be testifying against him.  (Guadarrama: Hr. 188).  She stated that

when Ortega was given a plea offer for 11 years, he was still thinking about fighting the case and

that "he was in doubt."  (Guadarrama: Hr. 190).  She also testified that, when Koppelman was

representing Ortega, she heard about a possible plea offer for 13 years, but she did not remember

the specifics.  Id.  She said that Ortega never told her about a plea offer for 20 years.  Id.

7.    Bronson's Testimony

Larry Bronson could recall little about his representation of Ortega, stating, "it's a long

time ago and I really don't remember the circumstances."  (Bronson: Hr. 213).  Bronson

explained his business relationship with Koppelman as follows: "Koppelman was employed on

an ad hoc basis case to case.  I think for a time he may have had access to the office . . . If I had a

case, I gave it to him to try and help him out."  (Bronson: Hr. 217).  For criminal cases, Bronson

"would initially interview the client [and if] it was something that [he] felt that [Koppelman]

could appropriately handle at that time, [Bronson] would give him [his] notes and let

[Koppelman] run with it."  (Bronson: Hr. 217-18).  For most cases, Bronson would charge a flat

fee whether or not the client went to trial, and when Koppelman did a case for him, Koppelman

would be paid a fee of some sort, but the fee arrangement would vary depending on the type of

case.  (Bronson: Hr. 218-19).  In some cases, Koppelman received a flat fee regardless of

whether the case went to trial.  (Bronson: Hr. 233).  During the time Bronson knew Koppelman,

Koppelman always seemed to be "in trouble financially."  (Bronson: Hr. 222).  When asked if he

had ever heard that Koppelman "may have gone to trial on in any case because he needed the

money," Bronson responded, "No."  (Bronson: Hr. 228).

On cross-examination, the Government asked Bronson about his general practices when

he represented criminal defendants.  Bronson testified that whenever he received a plea offer

from the Government, he shared it with his client because he "believed [he] had a duty to do it."

(Bronson: Hr. 231).  He also stated that at the time he represented Ortega he made sure to review

the sentencing guidelines with each of his clients and that he would explain to his clients that

they had the choice to plead guilty even without a plea agreement.  (Bronson: Hr. 232).  When

asked if he had ever disregarded a client's instruction to accept a guilty plea, Bronson answered,

"Absolutely not."  Id.

    D.    Post-Hearing Briefing

The parties submitted post-hearing briefs.[5]  After briefing concluded, Ortega made two

---

    [5]  See Government's Post-Hearing Proposed Findings of Fact and Conclusions of Law in
Response to Defendant's Motion to Vacate, Set Aside, or Correct His Sentence Pursuant to 28
U.S.C. § 2255, filed Aug. 23, 2013 (Docket # 47); Memorandum of Law in Support of Jorge
Gandia Ortega's Petition for Habear [sic] Corpus Relief, filed Aug. 27, 2013 (Docket # 48)
("Ortega Brief"); Government's Reply to Defendant's Post-Hearing Brief, filed Sept. 6, 2013
(Docket # 50); Jorge Gandia Ortega's Reply to Government's Post-Hearing Brief, filed Sept. 19,
2013 (Docket # 51) ("Ortega Reply Brief").

pro se submissions, apparently without the involvement of his attorney.  Ortega first filed a pro se motion on October 29, 2013, "to introduce corroborating evidence of counsel Bronson's proof of signature."  See Ex Parte Motion to Introduce Corroborating Evidence of Counsel Bronson's Proof of Signature, filed Oct. 29, 2013 (Docket # 53) ("Bronson Signature Motion").  With this motion, Ortega attempted to show that the letter from Bronson to Guadarrama, see Bronson Letter, which Bronson testified at the hearing that he did not write (Bronson: Hr. 210-11), was in fact written by Bronson.  See Bronson Signature Motion at 1.  Soon thereafter, on October 30, 2013, this Court granted Ortega's motion "to the extent that the Court will consider the evidence presented herein to be part of the record of the habeas corpus petition."  See Order, filed Oct. 30, 2013 (Docket # 54).  We have assumed for purposes of this ruling that the letter was written by Bronson, though this fact has no relevance to the disposition of the petition.

Next, on December 4, 2013, Ortega filed a pro se motion to acquire copies of the transcripts of the evidentiary hearing.  See Motion to Acquire Transcripts Based on Title 28 U.S.C. Section 753(f)(3), filed Dec. 4, 2013 (Docket # 55).  On December 6, 2013, the Court denied Ortega's motion because "communications to the Court relating to this case should come only from [Ortega's appointed] counsel."  See Order, filed Dec. 6, 2013 (Docket # 56).  The Court noted that the requested transcripts had already been provided to Ortega's counsel.  Id.

II.   APPLICABLE LEGAL PRINCIPLES

A.   Law Governing Petitions Under 28 U.S.C. § 2255

28 U.S.C. § 2255 provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized

> by law, or is otherwise subject to collateral attack, may move the court
> which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  Relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (per curiam) (internal quotation marks and citation omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).

"The petitioner in a § 2255 proceeding bears the burden of proof by a preponderance of the evidence." Feliz v. United States, 2002 WL 1964347, at *4 (S.D.N.Y. Aug. 22, 2002) (citing Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000); Harned v. Henderson, 588 F.2d 12, 22 (2d Cir. 1978) ("It is, of course, well settled that in federal habeas corpus proceedings the burden of proving a constitutional claim lies with the petitioner and that the nature of that burden is the customary civil one of a preponderance of the evidence.")).

B.     Law Governing Ineffective Assistance of Counsel Claims

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness,' and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010).

In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "'[j]udicial scrutiny . . . must be highly deferential'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (alteration in original) (quoting Strickland, 466 U.S. at 689); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence).

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)); accord Purdy v. United States, 208 F.3d 41, 44-45 (2d Cir. 2000) ("[D]efense counsel 'must give the client the benefit of counsel's professional advice on th[e] crucial decision' of whether to plead guilty.") (quoting Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996)) (additional internal quotation marks and citations omitted).  Thus, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012). "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed."  Purdy, 208 F.3d at 45 (citations omitted).  However, the "ultimate decision whether to plead guilty must be made by the defendant," and "a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer."  Id. (citations omitted).  The Second Circuit has further held that "[c]ounsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government),

26

whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision."  Id.

III.   <u>DISCUSSION</u>

In his post-hearing brief, Ortega primarily focuses on the question of whether Bronson was ineffective in advising Ortega to go to trial rather than plead guilty.  <u>See</u> Ortega Brief at 15-19.  However, Ortega's habeas claims as to the time period when he was represented by Bronson have already been dismissed.  <u>See</u> <u>Ortega I</u>, 2012 WL 2478277, at *13; <u>Ortega II</u>, 2013 WL 81330, at *2.  Moreover, as was noted in <u>Ortega I</u>, "in the event it was found that Koppelman acted effectively with respect to his representation of Ortega, Bronson's alleged failings would become irrelevant."  2012 WL 2478277, at *13.  As was explained in <u>Ortega I</u>, there is no evidence that the Government made a plea offer during the relatively brief period that Bronson represented Ortega.  <u>Id.</u>, at *12.  And there is no reason to believe that a plea to the charge at the time Bronson was discussing it with Ortega would in fact have resulted in the sentencing ranges that Bronson was predicting, given that the amount of cocaine at issue in the conspiracy charge was not specified in the indictment.  <u>See</u> Indictment, ¶ 2.  Bronson simply assumed that the amount of cocaine that would be used for the sentencing calculation was 20 kilograms.  <u>See</u> Bronson Letter at 1.  At a sentencing hearing, however, the Government would have been free to offer evidence of a much higher drug quantity as was plainly their intent.  <u>See</u> Kim Notes. Moreover, any alleged failure by Bronson to arrange a plea based even on the drug quantity he assumed could not have caused Ortega prejudice because the Government later offered Ortega a plea, at the reverse proffer, on terms essentially identical to the "straight up" plea allegedly

considered by Ortega while he was represented by Bronson.  Id., at *13.[6]

To the extent that Ortega is complaining that Bronson did not correctly communicate to him the strength of the Government's case, our conclusion below that Koppelman was effective in doing so means that Bronson's alleged failure was rendered irrelevant, as Ortega had been properly advised as of the time he decided not to accept the Government's December 2003 plea offer.  Despite Ortega's assertion that Bronson "was active in the case until the eve of trial," Ortega Brief at 12, there is no non-speculative evidence to support this conclusion.  To the contrary, the evidence suggests that Bronson represented Ortega only until April 2003, as Ortega himself testified (Ortega: Hr. 9, 96)  — in other words, for the first two months following Bronson's his initial appearance — and that Ortega never saw Bronson again (Ortega: Hr. 96). The evidence was also undisputed that Koppelman represented Ortega for the remainder of the case, including the more than seven months between Bronson dropping out of the case and the Government making its December 2003 plea offer.  See, e.g., Ortega Decl. ¶ 11.

Turning to the issue of whether Koppelman provided effective assistance of counsel, Ortega makes almost no argument as to the first branch of the two-part Strickland inquiry — that

---

[6]  As was noted in Ortega I, any small differences in the terms of the Government's December 2003 offer and sentence that Bronson imagined would result from a plea to the indictment were

> attributable to the fact that the Government [in December 2003] viewed Ortega has having a criminal history of III, rather than II . . . But there is no reason to believe that had Ortega made a "straight up" plea while he was being represented by Bronson that the Government would have asserted that Ortega was in a criminal history category of II (as Bronson assumed) rather than III.  The information about Ortega's criminal history was available to the Government, pre-trial services and the Court upon investigation.

2012 WL 2478277, at *13.

is, whether Koppelman's performance fell below an objective standard of reasonableness.  See Ortega Brief at 19-20.  Without pointing to any evidence in the record on this point, Ortega simply contends that Koppelman "had no intention to negotiate a plea or attempt to have Ortega plead guilty." Ortega Brief at 20.  But other than this attack on Koppelman's representation, in discussing the performance prong of the Strickland claim, Ortega relies exclusively on Bronson's conduct.  Id. at 14-20.  In the course of his discussion of the prejudice prong, Ortega makes some additional references to the alleged infirmity of the advice provided to him by Koppelman.  He suggests that Koppelman's advice fell below the required level of competency to the extent Koppelman suggested that "there will only be one witness at trial."  See id. at 23-24.  Ortega suggests also that Koppelman may have intentionally given Ortega bad advice because he earned more money by taking the case to trial.  See id. at 20-21.

On the issue of prejudice, Ortega contends that Koppelman's advice prejudiced him because, in the absence of Koppelman's improper advice, he would have taken the plea offer because he was always "willing to admit his guilt and had always intended to plead guilty."  Id. at 25-26.

Before considering the merits of Ortega's ineffective assistance of counsel claim, we make certain credibility findings based on our consideration of the testimony and the exhibits offered into evidence.

A.      Credibility Findings

First, we find that important parts of Ortega's testimony were inconsistent with other statements he has made under oath and other evidence in the record, and therefore judge such statements not to be credible.  During the hearing, Ortega claimed on several occasions that he directed his attorneys to arrange for him to plead guilty but that they disregarded his instructions.

For example, Ortega testified that at the reverse proffer he told Koppelman to tell AUSA Kim that he was accepting the 11-year plea offer, but for whatever reason, the plea offer was never accepted. (Ortega: Hr. 94-95). Ortega reiterated in later testimony, "[Koppelman] ignored my request" to take the 11-year plea and "if he would have paid attention to my request I would not have been here. I would have been serving the eleven years." (Ortega: Hr. 105). Additionally, Ortega testified that he later told Koppelman to accept a 13-year plea offer but that Koppelman failed to communicate this acceptance to the Government. (Ortega: Hr. 105-6). But in his written declaration, Ortega never once claimed that Bronson or Koppelman ignore his requests to plead guilty, though such information would have been critical to the points he was making in the declaration. In the declaration, he suggested only that his attorneys <u>advised</u> him not to plead guilty. <u>See</u> Ortega Decl. ¶ 16 ("the only reasons for me not to accept the 13 year plea offer was due to the wrong information that my lawyers gave me."); <u>id.</u> ¶ 17 (shortly before trial, Koppelman "again advised me to proceed to trial, and I relented"). In addition, on cross-examination, Ortega conceded that, "[u]nder the advice of the lawyers," he "decided to reject" the plea agreement that Kim had offered. (Ortega: Hr. 99).

Furthermore, testimony from Koppelman leads us to reject Ortega's claim that he attempted to plead guilty but was thwarted by Koppelman. Koppelman, who this Court judged to be a credible witness, testified that he did not recall Ortega ever telling him that he wanted to plead guilty or instructing him to accept a plea offer. (Koppelman: Hr. 124). While Koppelman did not have a specific memory of his conversations with Ortega, he was unequivocal that he had never prevented a client from pleading guilty and that Ortega had never given him such a direction. <u>Id.</u> The specific testimony was as follows:

Q. Do you recall whether Mr. Ortega ever instructed you to accept a plea

agreement that had been offered by the government?

A.  The only thing I can say is that as far as I know I have never failed to convey an indication that my client wanted to plead, if such an indication had been made to me.  I don't recall any circumstance under which the client told me that he wanted to plead guilty.

Q.  And when you say the client, are you saying Mr. Ortega specifically or clients in general?

A.  No, I have had clients who told me that they want to plead guilty.  I'm referring now to Mr. Ortega.

Id.; see also id. at 149 ("I would never ignore or override in some way a client's desire to plead guilty.").

Because we conclude that Ortega testified falsely on this critical point, we also do not credit his testimony regarding the equally critical conversations with his attorneys about the strength of the Government's case and the advice regarding the potential penalties he faced if he were convicted at trial.  Additionally, his testimony on this point was contradicted by credible testimony from Koppelman.  In the face of persistent questioning at the hearing, Ortega insisted that, at the reverse proffer, Koppelman and Kim did not discuss the evidence that the Government had against Ortega.  (Ortega: Hr. 36-37).  However, we do not believe that the Government held a reverse proffer session at which the Government's evidence was not discussed.  Indeed, Kim, a highly credible witness, testified that the whole purpose of a reverse proffer is for the Government to discuss "the strength of the evidence" that it intended to use against the defendant and to go over "the likely evidence that would come up at trial and how it would come up." (Kim: Hr. 43-44).  Although Kim did not remember the specifics of the reverse proffer with Ortega, he believed that he would have discussed any cooperating witnesses "because [the Government was] going to put on cooperating witnesses [and] the fact that they were cooperating was not a secret."  (Kim: Hr. 49).  Similarly, Koppelman testified that, although he did not remember the specifics of this reverse proffer, they likely discussed the Government's evidence

31

because "a reverse proffer has to be more than a plea offer and a discussion about guidelines.  The whole idea of the reverse proffer is to find out what the evidence is either to help at trial or to help in deciding whether to plead guilty."  (Koppelman: Hr. 151).  Finally, after being shown a contradictory statement in his written declaration, even Ortega admitted that Koppelman and Kim "debated the strength of their case" at the reverse proffer.  (Ortega: Hr. 39).

Taking into account Kim and Koppelman's testimony about the reverse proffer, along with Ortega's self-contradicting statements, we find incredible Ortega's assertion that he was unaware of the strength of the Government's case and of the specific evidence the Government intended to offer at trial, including any information being supplied by cooperating witnesses.  Additionally, given that the reverse proffer meeting lasted approximately 30 to 40 minutes (Ortega: Hr. 40), we conclude that Kim must have described in detail what evidence he expected to use against Ortega.

For similar reasons, we do not credit Ortega's assertion that, until the date of the trial, Koppelman told Ortega that the Government's case was "weak" in the sense that the Government was unlikely to prevail (Ortega: 28, 99), and that Koppelman continued to tell Ortega that there would only be one witness testifying against him (Ortega: Hr. 70-71).  According to Ortega, he told Koppelman that he heard from Gonzalez that multiple witnesses would be testifying against him (Ortega: Hr. 28), but that Koppelman did not acknowledge that there would be multiple witnesses until the day of the trial (Ortega: Hr. 79).  It makes no sense, however, that Koppelman would continue to tell Ortega that there would be only one witness if he had specific information — either from Ortega, as Ortega testified (Ortega: Hr. 28), or from the Government — that there

32

would be more than one witness.[7]

It also makes no sense that Ortega would have simply accepted any such claim from Koppelman without challenging it given that Ortega knew at that time about the other witnesses. Indeed, Ortega's wife admitted that during the first few months of Ortega's incarceration, Ortega told her about the evidence he expected the Government to present at trial, including the 20 kilograms of cocaine that had been seized by the Government and that both Gonzalez and Rosario would be testifying. (Guadarrama: Hr. 188).

We credit Koppelman's testimony that it was his general practice to explain to clients the risks of going to trial and further find that this testimony is highly relevant as to what actually happened in Ortega's case. Specifically, Koppelman credibly testified, "I would never tell a client that [the Government has] nothing against him, because for one thing I wouldn't know if they had anything against him and I don't think it was any secret, if I recall correctly, that at the very least they had one cooperator and I believe they had drugs. I don't remember now what else they had, but I could never tell someone they have nothing against them." (Koppelman: Hr. 149).

We also refuse to credit Ortega's more specific claims that nobody explained to him how being a member of a conspiracy could affect his sentence by increasing the amount of drugs he was charged with possessing and that he understood from Kim that only 20 kilograms of drugs would be at issue. (Ortega: Hr. 77). Koppelman testified that it was his practice to explain to his clients the meaning of conspiracy charges, so given the relevance of such information to Ortega's criminal case, we find it highly likely that he explained this factor to Ortega. (Koppelman:

---

[7] To the extent Ortega suggests that Koppelman had a financial motive to take the case to trial rather than allow a plea, we conclude that Koppelman credibly testified that he was getting no additional money for taking the case to trial (as is explained further below).

Hr. 157-58). Also, given that Kim explained to Ortega that his sentence would be at least 360

months if convicted after a trial, and that such a sentence could only be given based on a quantity

of 150 kilograms or more of drugs, see Kim Notes at 1, we find that Kim never told Ortega that

his case involved only 20 kilograms of drugs. We also find that Koppelman discussed the correct

drug quantities at issue with Ortega. Koppelman credibly testified on this point:

> I have no specific recollection, but it just seems to me that if there was a discussion
> of the guidelines at the reverse proffer, then if there were drugs that were not part
> of the 20 kilos that were going to be taken into consideration for guidelines
> purposes, that it would have been discussed at that time.

(Koppelman: Hr. 158). Thus, we find that Ortega was properly counseled by Koppelman that

much more than the 20 kilograms of cocaine would be at issue at trial and that, if the jury

accepted a cooperator's claim regarding Ortega's involvement in the conspiracy, this quantity

could lead to a sentence of 360 months or more.

We also reject Ortega's claim that after the reverse proffer Koppelman said, "Relax. If

these people show me anything, if there is a problem, if I see anything, we plead guilty." (Ortega:

Hr. 71). Such an assertion would have been absurd given that there was a deadline for accepting

the plea offer and that a plea to the charges afterwards could not possibly have resulted in a

sentence anywhere close to the plea offer.

Finally, we find credible Koppelman's testimony that he got no monetary compensation if

he took the case to trial. (Koppelman: Hr. 156) ("monetarily speaking, it was of no concern to me

whether the case went to trial or not."). In his post-hearing brief, Ortega suggests that Koppelman

advised Ortega to go to trial because Koppelman earned more money on a case when it went to

trial. See Ortega Brief at 20 ("Koppelman [sic] wasn't going to try the case for free and if Ortega

pled guilty it can be inferred he would not get $5,000. From his financial troubles it can be

34

inferred that it blinded his primary responsibilities in the case — zealously represent your

client.").  But Koppelman credibly testified that he did not ever take any fees directly from Ortega

or Ortega's family because Bronson had negotiated the fee arrangement with Ortega, not

Koppelman.  (Koppelman: Hr. 125).  This statement is supported by both Ortega and

Guadarrama's testimony.  Ortega testified that, at the beginning of the case, he paid Bronson

$5,000 (Ortega: Hr. 11), but he never testified that he paid Koppelman anything.  Guadarrama

testified that she paid Bronson $10,000 up front for his services in representing Ortega

(Guadarrama: Hr. 181), and that she then mailed Bronson ten additional payments of $1,000 each

(Guadarrama: Hr. 183).[8]

B.    Merits of the Ineffective Assistance of Counsel Claim

In determining whether Koppelman provided effective assistance of counsel to Ortega

with respect to Ortega's decision to go to trial rather than accept a plea offer, we begin by finding

that there was only one plea offer that was made to Ortega.  Although Ortega's filings referred to

both an "11-year" and a "13-year" plea offer, see, e.g., Ortega Decl. ¶¶ 13-14, Ortega made clear

at the hearing that these two time periods referred to only one plea offer — that is, that the offer

somehow referred to both periods of incarceration (Ortega: Hr. 37, 100) — and that this plea offer

was made at the December 2003 reverse proffer session (Ortega: Hr. 37).  We find that the

Government made an offer, as described in Kim's notes, that the offer was based on an

assumption that Ortega had a criminal history category of III, and that the offer consisted of a

_____

[8]  Bronson's recollection of his professional arrangement with Koppelman more or less
corroborated Koppelman's explanation.  Bronson testified that for most of his cases, Bronson
would charge clients a flat fee whether or not the client went to trial (Bronson: Hr. 218), and for
some of the cases referred to Koppelman, Koppelman received a flat fee regardless of whether
the case went to trial (Bronson: Hr. 233).

plea that would result in a guidelines range of 135-168 months – that is, a range of 11 years and 3 months to 14 years.[9]

Ortega argues that Koppelman unreasonably advised Ortega that the Government had only "one witness" to testify against him. See Ortega Brief at 23 ("No competent lawyer . . . would ever state to a client and advise a family member that there will only be one witness at a trial.") But, as just discussed, there is no credible evidence that Koppelman believed, or represented to Ortega that he believed, that there would only be "one witness." While Ortega has testified that until the date of the trial Koppelman continued to tell him that there would only be one cooperating witness (Ortega: Hr. 28, 71, 79), we do not credit this assertion because, as we have already discussed, by the date of the reverse proffer Koppelman and Ortega both knew that at least Gonzalez and Rosario would be testifying against Ortega. Indeed, when Koppelman first took over Ortega's case, Ortega told Koppelman that he had heard from Gonzalez that multiple witnesses would be testifying against him. (Ortega: Hr. 28). Additionally, we find that Kim disclosed the identity any Government cooperators at the reverse proffer. (Kim: Hr. 49).

There is no strong evidence on the question of what specific advice Koppelman gave Ortega regarding whether he should take that offer. But, for the reasons already stated, we do not credit Ortega's testimony that Koppelman told him to go to trial because the Government had a "weak case." (Ortega: Hr. 28). We also find that the fact the Government had evidence of Ortega being a member of a conspiracy involving "hundreds of kilograms" of cocaine was explained to

---

[9]  Kim testified that shortly before Ortega's trial he may have told Koppelman about another plea offer for approximately 20 years (Kim: Hr. 53-54), but Ortega does not remember ever receiving that offer (Ortega: Hr. 100). We do not find it important to determine whether such an offer was ever made because we find that based on Koppelman's practices, he would have conveyed it to Ortega and would have abided by any request from Ortega to accept it.

Ortega at the reverse proffer (Kim: Hr. 47; Kim Notes), and that Koppelman followed his

standard practice in explaining to Ortega the nature of a conspiracy charge and the potential effect

of the hundreds of kilograms of cocaine on Ortega's sentence following a conviction

(Koppelman: Hr. 157-58).

    That fact that Ortega decided not to plead guilty and then subsequently lost at trial does

not, on its own, demonstrate that Koppelman gave him any unreasonable advice.  See generally

United States v. Millan, 22 F. App'x 35, 36 (2d Cir. 2001) (summary order) ("trial counsel's

advice to proceed to trial rather than to plead guilty was at the time strategically valid, even if

ultimately unsuccessful.").  The Government did not have any surveillance or wiretap evidence

against Ortega and had not seized any physical evidence from Ortega's person when he was

arrested.  (Ortega: Hr. 13).  In a case that relies heavily on cooperator testimony, there is

obviously a possibility that the jury will refuse to believe the cooperators.  Also, Ortega's

decision to reject the plea offer must be viewed against the backdrop of what Ortega actually

knew at that time.  Ortega was familiar with the cooperating witnesses and thus might have had

his own reasons for thinking that the jury would disbelieve them.  Additionally, Ortega obviously

knew about his own involvement in the drug conspiracy and must have understood that his co-

conspirators might testify about this.  Moreover, Ortega was present at the reverse proffer session,

during which this evidence was described.  Despite this, Ortega makes the conclusory allegations

that Koppelman's advice was based on a "faulty and false analysis of the facts of the case,"

Ortega Reply Brief at 3, and that Koppelman's experience "should have enlightened [him] that all

federal cases are strong," id. at 6.  But we conclude that any advice from Koppelman must have

been consistent with the facts Ortega knew or else Ortega would have protested any effort by

Koppelman to underplay the actual situation he was facing.

Furthermore, the record suggests that Koppelman provided adequate representation by "inform[ing] the defendant . . . [of] the alternative sentences to which he will most likely be exposed."  See Purdy, 208 F.3d at 45 (citations omitted).  At the evidentiary hearing, Kim explained that part of his standard procedure in conducting reverse proffers was to explain to defendants "the difference that they were likely to face between going to trial and not going to trial."  (Kim: Hr. 43).  We find that Kim went through this process at Ortega's reverse proffer, as evidenced by Kim's handwritten notes from the meeting which include calculations of Ortega's prison sentence under different scenarios.  (Kim: Hr. 47-48; Kim Notes).  Koppelman too stated that it was his practice to explain to defendants what the guidelines were for the crimes they faced and that he conducted such a review with "[a]ll" of his clients.  (Koppelman: Hr. 121; see also id. at 146-147 (testifying that he reviewed mandatory minimum sentences with his clients)).  Indeed, Ortega has admitted that, at the time of the reverse proffer, he knew that if he lost at trial that his prison sentence would be "20 years" (Ortega: Hr. 39), though we believe he knew it would be the much higher 360-month figure.

In light of the bountiful information provided to Ortega by the Government and by Koppelman at the reverse proffer, we do not find that any prior statements from Bronson regarding the Government's case — even if they did not properly evaluate the Government's case — could have had any bearing on whether Ortega received ineffective assistance of counsel. Ortega had complete information and advice by the time he had to make a decision as to whether to take the Government's December 2003 plea offer.[10]

---

[10] Ortega's brief makes reference to Koppelman's alleged failure to "negotiate a plea." Ortega Brief at 20.  It is unclear what is meant by this assertion.  To the extent that Ortega intends to argue that Koppelman would not communicate to the Government or to the court Ortega's own desire to plead guilty, we reject this assertion as it is unsupported by evidence.  To

Ortega also argues that Koppelman's assistance was objectively unreasonable because his advice to go to trial was based not on the strength of the Government's case but instead on Koppelman's own desire for personal financial gain. Ortega Brief at 20-21. Ortega contends that, because of this improper financial motive, Koppelman came into the case with the desire to bring it to trial and that any plea negotiations that Koppelman entered into were "half-hearted at best." Ortega Reply Brief at 6. It is well-established that "[a] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." See Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980). It is also true that some fee arrangements can cause an attorney to have an actual conflict of interest in the representation of his or her client. See Winkler v. Keane, 7 F.3d 304, 307-8 (2d Cir. 1993) (finding that attorney's contingency fee agreement with criminal defendant client created an actual conflict of interest because the agreement "provided trial counsel with an extra $25,000 only if [client] was acquitted or otherwise not found guilty [so that] trial counsel had a disincentive to seek a plea agreement"). However, there was nothing improper about Koppelman's fee arrangement and it did not even incentivize him to bring Ortega's case to trial.

In sum, we find that Ortega has not shown that Koppelman provided "objectively unreasonable" assistance of counsel. Because Ortega is unable to satisfy this first prong of the Strickland test, we need not reach the issue of whether he has established prejudice. See Strickland, 466 U.S. at 698 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry

---

the extent that it is intended to assert that Koppelman should have tried to get a better deal from the Government than the 135 to 168 month offer, we reject the argument as there is no evidence in this record that would allow a conclusion that any more favorable deal would have been available.

claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); Palacios v. Burge, 589 F.3d 556, 562 (2d Cir. 2009) (declining to reach "prejudice" prong under Strickland where petitioner could not satisfy "performance" prong).

IV.    CONCLUSION

For the foregoing reasons, Ortega's petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Laura T. Swain, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Swain. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated:   January 17, 2014
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

40